**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| ROBERT D. WILSON, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 3:20-CV-586-JVB-MGG |
| | ) | |
| WILLIAM HYATTE, *et al.*, | ) | |
| Defendants. | ) | |

## <u>OPINION AND ORDER</u>

This matter is before the Court on Defendants' Motion for Summary Judgment [DE 94] and on Plaintiff Robert Wilsons's Motion for Partial Summary Judgment [DE 99]. Both motions were filed on May 8, 2023.

## PROCEDURAL BACKGROUND

This lawsuit is proceeding on Wilson's Third Amended Complaint, filed on June 21, 2021, with Defendants' consent. The named defendants are William Hyatte, Sharon Hawk, Officer Brady, Kimberly Smith, James Williams, Montrel McGee, and Casie Klepinger. Wilson brings seven claims in his pleading, all brought under 42 U.S.C. § 1983. In Counts I, II, and III, he alleges failure to protect against Defendants Hyatte, Hawk, and McGee, respectively. In Counts IV, V, and VI, he alleges supervisory liability against Defendants Hyatte, Hawk, and Klepinger, respectively. In Count VII, he alleges failure to provide medical attention against Defendant Brady.

Defendants moved for summary judgment on all counts and as to all defendants. Wilson filed a response on March 8, 2024. Defendants replied on March 22, 2024.

Wilson moved for summary judgment on Counts I, II, and III as to liability only. Hyatte, Hawk, and McGee (the only defendants to Counts I, II, and III) filed a response on June 5, 2023. Wilson replied on June 20, 2023. Though Hyatte, Hawk, and McGee contend that Wilson did not

file a statement of material facts, Wilson's statement is on the docket at entry number 100, and Wilson has provided evidence that he served the statement (which is sealed on the docket) on defense counsel via email. Hyatte, Hawk, and McGee do not refute this evidence.

## SUMMARY JUDGMENT STANDARD

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying the evidence, if any, which it believes demonstrates the lack of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party supports its motion for summary judgment with affidavits or other materials, the burden shifts to the non-moving party to show that an issue of material fact exists. *Keri v. Bd. of Tr. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006). Rule 56(e) specifies that once a properly supported motion for summary judgment is made, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *Keri*, 458 F.3d at 628. The same standard applies when

considering cross-motions for summary judgment. *Int'l Bhd. of Elec. Workers, Loc. 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Liberty Lobby*, 477 U.S. at 249-50.

On cross motions for summary judgment, a court construes, "all inferences in favor of the party against whom the motion under consideration is made." *Speciale v. Blue Cross & Blue Shield Ass'n*, 538 F3.d 615, 621 (7th Cir. 2008). The Court looks to the burden of proof each party would bear on an issue at trial. *Diaz v. Prudential Ins. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007) (quoting *Santaella v. Metro. Life Ins.*, 123 F.3d 456, 461 (7th Cir. 1997)).

## MATERIAL FACTS

### Background on Miami Correctional Facility

Miami Correctional Facility ("Miami") is a men's prison in Indiana. In 2019 and 2020, William Hyatte was warden at Miami, Sharon Hawk was deputy warden, Kimberley Smith was a correctional case manager, James Williams was a unit team mangager, Montrel McGee was an investigator, and Casie Klepinger was an investigator and was McGee's supervisor. Klepinger assigned McGee to investigations and reviewed his reports. (Klepinger Dep. 22:12-20, 90:21-91:3, 95:17-23, 107:8-11, 108:7-13, ECF No. 97-10 & 97-11).

During 2019 and 2020, Miami had an endemic problem with gang violence. (Hawk/Hyatte RFA No. 33, ECF No. 102-6; Hawk Dep. 117:14-20, ECF No. 102-3; McGee Dep. 193:2-194:12, ECF No. 102-4). Miami had more security threat group (STG) members than any other prison in Indiana during that timeframe. (McGee Dep. 193:2-194:12, ECF No. 102-4). Hawk estimated that 65% of Miami's inmates were involved in a gang. (Hawk Dep. 47:7-23). Low staffing levels made

it harder for security staff to keep prisoners safe from violence by other prisoners. (McGee Dep. 196:1-5, 235:5-14, ECF No. 102-4). Violence at the prison was pervasive. *Id.* at 193:2-194:12; (Hyatte Dep. 123:8-25, ECF No. 102-2). Some prisoners preferred suicide watch over general population because of safety concerns. (Hawk Dep. 98:11-99:11, ECF No. 97-9). Prisoner violence at Miami was so bad during the relevant period, that the prison was in the process of shutting down some units to mitigate further issues. (McGee Dep. 194:2-12, ECF No. 102-4). McGee testified that, at Miami, most white men not affiliated with any gang were preyed upon. *Id.* at 160:16-161:5. Still, Hawk testified that she had no concerns about gang violence at Miami while she was deputy warden there. (Hawk Dep. 42:24-42:2, ECF No. 97-8).

Klepinger was aware of violence issues at Miami because she attended incident management meetings and reviewed all investigation reports. (Klepinger Dep. 35:6-36:3, 131:24-132:7, ECF Nos. 97-10 & 97-11). Klepinger's review of the reports was for matters such as spelling, grammar, proper identification of individuals, and chronology. *Id.* at 35:9-14. The caseload was so high during this period that Klepinger joked with a co-worker that each inmate should be limited to one Prison Rape Elimination Act (PREA) complaint every 90 days because it was hard to track all of the reports. *Id.* at 129:10-131:8.

### Wilson has Safety Concerns, Requests Protective Custody

Plaintiff Robert Wilson was imprisoned at Miami during 2019 and 2020. (Wilson Dep. 8:10-12, ECF No. 102-1). Wilson had joined a gang called the Hellraisers in late 2014. *Id.* at 10:17-22. By the time Wilson arrived at Miami in 2016, he had started covering his gang tattoos and leave the Hellraisers. *Id.* at 11:17-12:8. By covering up his tattoos, Wilson was signaling to other gang members that he was no longer in the gang. *Id.* at 12:17-13:2.

4

Wilson testified to concerns for his safety beginning in 2019. *Id.* at 13:3-15:6. Wilson's testimony was as follows. In May 2019, a couple of Hellraisers approached Wilson, showed him a knife, and told him that he had to leave the housing unit the prison had assigned him to live in. *Id.* at 13:7-17. Wilson could tell these prisoners were Hellraisers because of their tattoos. *Id.* at 15:10-16. After raising the issue with another officer, Wilson filled out a written request for protective custody, and he was taken to see McGee. *Id.* at 16:13-17:14. McGee told Wilson that Wilson needed to give more information for protective custody to be granted, so the two talked. *Id.*

Wilson told McGee that he was a "covered up" Hellraiser, meaning that he had once been, but was no longer, a member of the Hellraiser gang. (McGee RFA No. 1, ECF No. 102-7). Wilson told McGee about the Hellraisers who showed Wilson a weapon and told McGee that the Hellraisers had threatened to stab him with that weapon. *Id.* at No. 2. Wilson asked McGee for protective custody because he had been threatened by members of the Hellraisers. *Id.* at No. 4. McGee told Hawk and Hyatte about Wilson's request for protective custody. *Id.* at Nos. 11, 12.

Hyatte reviews all protective custody requests as a matter of practice. (Hyatte Dep. 48:7-49:7, ECF No. 102-2; Hawk/Hyatte RFA No. 26, ECF No. 102-6). At the time Wilson's requests for protective custody were denied, Hyatte and Hawk were aware of Wilson's report of being threatened by Hellraisers. (Hawk/Hyatte RFA No. 11, ECF No. 102-6). Wilson testified that he also sent written messages to Hawk and Hyatte, explaining his situation. (Wilson Dep. 96:4-23, 97:11-98:14, 99:5-7, 100:8-101:9, ECF No. 102-1).

McGee had the authority to grant Wilson's request for protective custody, but McGee denied the request. (McGee RFA Nos. 5, 6, ECF No. 102-7). Hyatte and Hawk also had the authority to grant Wilson's request, and they also denied it. (Hawk/Hyatte RFA No. 16, ECF No.

102-6). McGee made Hawk and Hyatte aware that Wilson's request for protective custody was denied. (McGee RFA No. 12, ECF No. 102-7). McGee, Hawk, and Hyatte took no steps to help Wilson receive protective custody. *Id.* at Nos. 6, 7, 8, 14; (Hawk/Hyatte RFA Nos. 12, 13, 17, ECF No. 102-6). Because his protective custody request was denied, Wilson remained in general population. (Wilson Dep. 16:13-17:14, ECF No. 102-1). For a week while his request for protection was pending, Wilson was placed in a secure dorm; he was then returned to his assigned housing unit. *Id.* at 38:9-39-18.

Hawk testified that a prisoner's report of being targeted by a gang was enough to open an investigation. (Hawk Dep. 47:1-6, ECF No. 97-8). A request for protection would be denied if it could not be substantiated. *Id.* at 47:7-9. The prison required proof for protective custody to be given, such as identity of offenders and specific dates, times, and locations of threats. *Id.* at 48:21-49:4.

### Physical Assaults on Wilson

Wilson stopped going to meals because meals were served to inmates from multiple dorms at the same time in the same place and Wilson worried he would be seen by Hellraisers and attacked. (Wilson Dep. 39:19-40:9, ECF No. 102-1). A correctional officer reported that Wilson was "isolated" and avoiding the chow hall. *(*Wise Decl., ECF No. 102-14). Wilson was not receiving any money (to buy commissary food), so he eventually went to the chow hall for a meal. (Wilson Dep. 40:1-9, ECF No. 102-1).

Wilson testified that, on July 18, 2019, while Wilson was at the chow hall, a Hellraiser named Joshua Crider and another inmate approached Wilson. *Id.* at 41:14-43:2; *see also* (C. Johnson Decl., ECF No. 102-12; Crider Rep., ECF No. 102-9). A witness reported that Crider shook Wilson's hand and then punched Wilson in the face. (C. Johnson Decl., ECF No. 102-12;

Crider Rep., ECF No. 102-9). Witnesses added that Wilson did not fight back or throw any punches. (Bohlen Decl., ECF No. 102-13; C. Johnson Decl., ECF No. 102-12; G. Johnson Decl., ECF No. 102-13; Crider Rep., ECF No. 102-9). The corrections officer who responded to the incident reported that he "saw two offenders in the yard in front of GHU striking each other and rolling on the ground." (Defs.' Ex A at 52, ECF No. 97-1). Wilson was disciplined for the incident. (Hyatte Dep. 74:8-79:2, ECF No. 102-2; Appeal Forms, ECF No. 102-10). Wilson appealed that discipline. (Appeal Forms, ECF No. 102-10).

In his appeal paperwork, Wilson explained that he was a covered-up Hellraiser, that Crider (a Hellraiser) attacked him, and that Crider's assault was not the first he'd endured since seeking protection. *Id.* Hyatte reviewed the appeal paperwork that contained this information. (Hyatte Dep. 74:8-79:2, ECF No. 102-2). Hyatte did nothing to protect Wilson. *Id.* at 73:14-18; (Hawk/Hyatte RFA Nos. 12, 13, ECF No. 102-6). Wilson and Crider were briefly put in segregation and then released back to general population. (Wilson Dep. 42:20-23, ECF No. 102-1).

Wilson testified that, once back in general population, he wrote messages to his counselor, to McGee, to Hyatte, and to Hawk, saying "I told you guys this was going to happen and no one's doing nothing for me." *Id.* at 42:24-45:6. Among Hyatte, Hawk, and McGee, no one took any steps at that time to help Wilson receive protective custody. (McGee RFA Nos. 6, 7, 8, 14, ECF No. 102-7); Hawk/Hyatte RFA Nos. 12, 13, 17, ECF No. 102-6).

After the Crider assault, Wilson was moved to "N" dorm. (Wilson Dep. 50:17-52:13, ECF No. 102-1). Wilson testified that, in September 2019, while he was living in N dorm, three Hellraisers (including one nicknamed "Grimm") entered Wilson's cell and kicked and punched him. *Id.* at 50:17-52:13, 68:7-70:13. The Hellraisers told Wilson that they beat him because he was a covered up Hellraiser. *Id.* at 50:17-52:13.

Wilson also testified that, few days later, still in September 2019, another prisoner punched Wilson in the housing unit. *Id.* at 53:17-54:17. Wilson was knocked unconscious and fell to the ground. *Id.* at 53:17-54:17, 55:18-56:5. The attacker was a "Folks" gang member. *Id.* at 54:11-20. The Hellraisers are a branch of the larger Folks organization. *Id.* After Wilson came to, he got up, went straight to his counselor, reported what happened, and his counselor moved him to a cell on the other side of the same housing unit. *Id.* at 56:24-57:23.

On January 23, 2020, Wilson was moved to a cell in "E" dorm. (Location History at 3, ECF No. 102-8; Wilson Dep. 58:9-14, ECF No. 102-1). Wilson testified that, while there, a high-ranking Hellraiser nicknamed Strange and another Hellraiser nicknamed Dizzy attacked him. (Wilson Dep. 61:8-62:5, ECF No. 102-1). After beating Wilson, they told him that he needed to pay protection money. *Id.* at 62:6-13. After the beating, Wilson was scared for his life. *Id.* at 60:13-61:7. Wilson immediately pushed the call button in his cell and told an officer that he wanted to seek protective custody. *Id.* at 60:13-61:7, 62:16-65:7. The officer refused to help him, so Wilson cut his arm to get help. *Id.* He then pushed the call button and told the same officer that he had cut his arm. *Id.* The officer released a nearby inmate to check on Wilson, and the inmate confirmed that Wilson was bleeding. *Id.* Still, the officer refused to let Wilson out of his cell to get medical attention or call medical attention for Wilson. *Id.*

**Wilson Placed on Suicide Watch, Requests Protective Custody**

Wilson's testimony continues that, after that officer left, the cell doors were opened for recreation and Wilson went to seek help. *Id.* at 64:18-68:6. Wilson walked to another part of the prison and showed other officers that he cut himself. *Id.* at 64:18-68:6. The officers cuffed him, threw him to the ground, tased him, and then took him to the medical unit, where his cuts were

treated. *Id.* Wilson was disciplined for Disfigurement because of his "inflict[ing] self-harm for reasons of protective custody." (Disciplinary Report, ECF No. 102-16).

Wilson was then taken back to "E" dorm and put on suicide watch. (Wilson Dep. 67:7-10, ECF No. 102-1). Inmates on suicide watch at Miami are housed in a normal cell in a general population dorm, but the prison keeps the cell door locked, and only allows the prisoner on watch out of his cell when escorted by staff. *Id.* at 30:3-31:4. Additionally, inmates on suicide watch are kept naked. *Id.* at 67:7-20. When an inmate is on suicide watch, the inmate's name and picture are hung outside the cell door. *Id.* at 71:3-12. Other inmates can harass inmates on suicide watch by coming up to their cells and throwing things in. *Id.* at 30:3-31:4. Wilson testified that, while on suicide watch, one of the Hellraisers that attacked Wilson back in N dorm, Grimm, located Wilson's cell. *Id.* at 71:3-20. Grimm came to Wilson's cell window while Wilson was on suicide watch, showed Wilson a knife, and threatened him. *Id.* at 68:15-69:10, 71:3-20.

Wilson reported the extortion at threats he experienced early in February 2020. (Feb. 14, 2020 Email, ECF No. 128-1). Based on that report, an officer wrote an email to Smith and Williams on February 14, 2020, saying that Wilson was a "patched over Hellraiser and the Gangster Disciples in the dorm found this out and began extorting him." The email continues "[Wilson] said his family has been paying money and has recently stopped… ." The email names three antagonists who Wilson identified. *Id.* The email was forwarded to Klepinger. *Id.*

Around the same time as Wilson's report of Grimm's threat, Wilson filled out two additional requests for protective custody. (Feb. 17, 2020 PC Request, ECF No. 102-25; Feb. 25, 2020 PC Request, ECF No. 102-26; Wilson Dep. 71:3-20, ECF No. 102-1). In the first, dated February 17, 2020, Wilson explained that he was a covered up Hellraiser, and gang members were

threatening to beat him and extorting him for protection money. (Feb. 17, 2020 PC Request, ECF No. 102-25).

That same day, Smith wrote an email: "my POD officer just called me in my office. Offender Wilson was just moved from suicide watch again, and is already threatening to cut himself as he does not want to live in the unit. He informed her that he is a hell raiser and that he is being extorted in the cell." (Feb. 17, 2020 Smith Email, ECF No. 128-3). Smith then denied Wilson's PC request, writing on it that Wilson did not give "definite names [or] cell locations," without referencing that three names were disclosed in the February 14, 2020 email message. (Feb. 17, 2020 PC Request, ECF No. 102-25). Wilson received a bed move in lieu of protective custody. *Id.* Smith did not normally have the authority to decide a PC request but could do so if she was acting case manager or acting unit team manager. (Smith Dep. 41:13-23, ECF No. 97-14).

Also that same day, Williams received an email from a mental health professional about Wilson. (Feb. 17, 2020 Devore Email, ECF No. 128-4). In that email, the mental health professional wrote that a "counselor told [Wilson] that if he comes off S[uicide ]W[atch] in EH[ousing ]U[nit] the offenders in there know he checked in so he will be assaulted . . . ." *Id.*

The next day, February 18, 2020, Smith forwarded Williams an email about Wilson. (Feb. 18, 2020 Smith Email, ECF No. 128-5). Smith wrote that "Wilson was very agitated stating the has has (sic) already cut himself numerous times and that he has not left his cell since he was released off suicide watch. . . . Wilson was terrified that when the door opened for his bunkie to go to chow that he would be hurt." *Id.*

Two days later, on February 20, 2020, Williams received another email about Wilson from the mental health professional, listing him as on suicide watch. (Feb. 20, 2020 Devore Email, ECF No. 128-6). The mental health professional wrote that Wilson, among others, "will just continue

to hurt themselves to go on S[uicide] W[atch] because to them it's better than being in a cell where the doors roll open all the time." *Id*.

In the request for protective custody dated February 25, 2020, Wilson explained that because he was a "covered up HellRaiser" the "HellRaisers or folks jump" him in "every dorm I get put on." (Feb. 25, 2020 PC Request, ECF No. 102-26). He said he was "tired of getting my ass beat so I am now on suicide watch." *Id*. He wrote that this is the "5th form I filled out" seeking protection. *Id*. Wilson identifies, either by name or nickname, a few individuals that are "part of this." *Id*.

On February 18, 2020, Wilson was moved to C dorm. (Location History, ECF No. 102-8). On February 26, 2020, Smith wrote to Williams that Wilson was "on that bedmove sheet for tomorrow" and reminded him that "Wilson is the one that was beaten up twice in EHU . . . ." (Feb. 26, 2020 Smith Email, ECF No. 128-7). The same day, Williams denied Wilson's February 25 protective custody request, writing that Wilson was "on suicide watch and doesn't come out of his cell, unless he's being escorted by staff." (Feb. 25, 2020 PC Request,  ECF No. 102-26). The unit team manager (Williams was Wilson's here) has the authority to grant PC requests. (Smith Dep. 37:20-38:1, ECF No. 97-14).

Wilson testified that, sometime in early March 2020, he submitted another request for protective custody. (Wilson Dep. 76:8-25, ECF No. 102-1).

Hyatte and Hawk were notified about all three of Wilson's 2020 requests for protective custody but did nothing to help protect Wilson. (Hyatte/Hawk RFA Nos. 12, 13, 17, 26, ECF No. 102-6).

**Larue Assault on Wilson**

Wilson reported to McGee that, on March 14, 2020, inmate Robert Larue invited Wilson to smoke in his cell. (Mar. 14, 2020 McGee Email, ECF No. 102-17). Wilson testified that Larue was a member of the Folks organization, which is affiliated with the Hellraisers. (Wilson Dep. 80:3-12, ECF No. 102-1). Prison records show Larue was a member of the 34th Street group. (Defs.' Ex. G, ECF No. 97-7). Wilson's report continued that, once inside the cell, where another inmate was already inside, Larue punched Wilson and then someone kicked Wilson in the head, knocking him unconscious. (Mar. 14, 2020 McGee Email, ECF No. 102-17; Ex. 28 - Video Interview). Wilson awoke with his boxers down and pain in his anus. (Mar. 14, 2020 McGee Email, ECF No. 102-17; Ex. 28 - Video Interview). He went to the medical unit where medical personal observed redness in his anus and recommended that Wilson be sent to an outside hospital for examination by sexual assault nurse examiner (SANE). (Mar. 14, 2020 McGee Email, ECF No. 102-17; Ex. 28 - Video Interview). In situations like this, on-site medical personnel do an initial exam to see if a SANE examination is warranted. (McGee Dep. 167:2-11, ECF No. 102-4).

Klepinger assigned McGee to investigate Wilson's sexual assault allegation. (Klepinger Dep. 90:16-91:8, ECF No. 97-11). Klepinger does not recall taking any steps to protect Wilson from further harm at this point. *Id.* at 93:3-7. McGee's investigation revealed evidence that Wilson was raped by a gang member. (McGee RFA No. 18, ECF No. 102-7). McGee's report of his investigation states that he reviewed video footage and reported that the footage shows all three enter the cell, stay there for twenty minutes, and upon exiting, Wilson had an unnatural walk. (Defs.' Ex. D, ECF No. 97-4). McGee testified that he considered possible causes of the walk, including drug use, being rendered unconscious, and being sexually assaulted. (McGee Dep. 141:16-144:8, ECF No. 102-4). McGee stated that he believed that Wilson had been sexually

assaulted. *Id.* at 153:19-154:2. Late on March 14, 2020, McGee emailed Hyatte and Klepinger, describing the assault, Wilson's medical symptoms, and video evidence he reviewed showing that Wilson had disarrayed clothing and an "unnatural walk" after the assault. (Mar. 14, 2020 McGee Email, ECF No.102-17). The investigation report states that the case was determined to be unsubstantiated because "there is no evidence to support that a sexual assault took place." (Defs.' Ex. D, ECF No. 97-4).

McGee testified that Wilson reported that the attack occurred because Larue believed that Wilson owed money; McGee agreed that if the debt was protection money, then it might be appropriate to investigate whether the attack was gang related. (McGee Dep. 162:9-163:9, ECF No. 102-4). In the video interview Wilson submitted as evidence, Wilson told McGee that his attackers mentioned paying protection to the Folks right before the attack began. (Ex. 28 - Video Interview).

Hawk testified that Wilson's PREA report from March 14th, 2020 was discussed at the April 22, 2020 PREA committee meeting. (Hawk Dep. 134:10-19, 146:9-22, ECF No. 102-3). Hawk confirmed that, if she was present at the facility when meetings occurred, she attended PREA committee meetings. *Id.* at 134:10-19.

Neither Hawk nor Hyatte granted any request for protective custody, and McGee took no steps to help Wilson receive protective custody. (Hyatte/Hawk RFA No. 30, ECF No. 102-6; McGee RFA No. 14, ECF No. 102-7).

**Further Assaults on Wilson**

Wilson was then moved to another dorm, called "A 1-2 side." (Wilson Dep. 84:7-11, ECF No. 102-1). The prison assigned a known Hellraiser named Chance Mata as Wilson's new cellmate. *Id.* at 85:4-16; (Defs.' Ex. G, ECF No. 97-7). McGee testified that he was surprised that Mata and

Wilson were assigned to room together since Wilson is a covered Hellraiser and the prison classified Mata as a Hellraiser, so it is not safe for them to be celled together. (McGee Dep. 187:21-188-17, ECF No. 102-4).

In April, before Wilson and Mata were assigned to be cellmates, Mata's then-cellmate (a covered Hellraiser) reported that Mata forced him to perform oral sex. (Past Report on Mata, ECF No. 102-19; Wilson Dep. 85:4-18, ECF No. 102-1). On April 16, 2020, once Mata and Wilson were cellmates, Wilson reported that Mata told him to "suck his dick" or get out of the cell. (Ex. 21, ECF No. 102-21). Wilson refused, and then Mata struck and choked Wilson, put his finger in Wilson's rectum, and made Wilson fondle his penis. *Id.* Hyatte and Hawk were notified by email but did nothing to protect Wilson. (Hyatte Dep. 92:7-15, ECF No. 102-2; Hawk Dep. 108:19-109:10, ECF No. 102-3; Hyatte/Hawk RFA No. 17, ECF No. 102-6).

McGee was assigned to investigate, the investigation revealed evidence that Wilson was sexually assaulted, and McGee did nothing to protect Wilson from further assault. (McGee RFA Nos. 14, 22, & 23, ECF No. 102-7). McGee, noting that Wilson's story changed from his initial report to his June 23, 2020 interview, specified that he could not substantiate the event as initially reported. (Defs.' Ex. F, ECF No. 97-6).

Wilson was later moved to P dorm and assigned Skylar Wilbur as his cellmate. (Wilson Dep. 87:1-21, ECF No. 102-1). Prison records report that Wilbur is a member of the Aryan Brotherhood group. (Defs.' Ex. G, ECF No. 97-7). Wilson reported that on April 29, 2020, Wilber and another inmate approached Wilson while Wilson was in his cell. (Wilbur Assault Packet at 2, ECF No. 102-23). The other inmate told Wilson to stand up and then punched Wilson, knocking him out. *Id.* Wilson woke up with feces in his boxer shorts and a weird feeling in his anus. *Id.* at 2, 11. When Wilson reported the incident, the officer noted "swelling to the face." *Id.* at 11. Wilson

was again taken to an outside hospital for an examination. *Id.* at 14. Medical records noted "forced penetration rectal area via 2 white offenders [with] ejaculation" under "History of Present Illness," and recorded the observation of "dried feces inner buttocks." *Id.* at 24. Wilson's boxers were collected as evidence. *Id.* at 11.

Klepinger opened an investigation and assigned McGee to investigate. (Defs.' Ex. E, ECF No. 97-5). McGee interviewed Wilson on May 1, 2020, and again on June 23, 2020. *Id.* At this later interview, Wilson asked that the investigation cease due to his fear of retaliation. *Id.* The case was closed as unsubstantiated. *Id.*

In October 2020, Wilson was transferred from Miami to Wabash Correctional Facility. (Wilson Dep. 8:3-12, ECF No. 102-1; Defs.' Ex. C at 8, ECF No. 97-3).

## ANALYSIS

The claims that Wilson brings against Defendants fall under 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

Wilson alleges failure to protect, supervisory liability, and failure to provide medical attention. The Eighth Amendment's protection against cruel and unusual punishment, incorporated against the states by the Fourteenth Amendment, imposes a duty on prison officials to, among other matters, "take reasonable measures to guarantee the safety of the inmates" and ensure inmates receive adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

**A. Counts I to III - Failure to Protect (Hyatte, Hawk, and McGee)**

Wilson argues that Hyatte, Hawk, and McGee failed to protect him. There are two elements of a failure to protect claim under § 1983: (1) the plaintiff was "incarcerated under conditions posing a substantial risk of serious harm" and (2) the defendant(s) acted with "deliberate indifference" to the plaintiff's health or safety. *Farmer*, 511 U.S. at 834. The deliberate indifference requirement has both objective and subjective components. That is, "(1) the harm to which the prisoner was exposed must be an objectively serious one; and (2) judged subjectively, the prison official must have actual, and not merely constructive, knowledge of the risk." *Sinn v. Lemmon*, 911 F.3d 412, 419 (7th Cir. 2018) (quoting *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (internal quotation marks omitted)). Both Wilson and Defendants argue that summary judgment should be entered in their favor on these claims.

1.    *Defendants' Motion for Summary Judgment*

a.    Hyatte and Hawk

Defendants argue that Wilson cannot show personal involvement by Hyatte or Hawk. The evidence viewed most favorably to Wilson is sufficient for a jury to find personal involvement by Hyatte. There is evidence that Hyatte was aware of the pervasive gang violence at Miami. McGee told Hyatte about Wilson's request for protective custody in 2019 (in which Wilson said he was being threatened by Hellraisers and was himself a covered up Hellraiser), and Hyatte reviews all such requests as a matter of practice. Wilson also sent written messages to Hyatte about his situation. Hyatte had the authority to grant Wilson's request for productive custody, knew that the request was denied, and did not grant protective custody to Wilson or take any steps to protect Wilson. As for the Crider incident, Hyatte read the appeal paperwork and did nothing to protect Wilson. Wilson also sent Hyatte a message about the incident. Hyatte also received notice of

16

Wilson's three requests for protective custody in 2020 but did nothing to protect Wilson. McGee emailed Hyatte describing Wilson's report of the Larue assault, but Hyatte did nothing to protect Wilson. Hyatte was notified about Wilson's report of the Mata assault, but Hyatte did nothing to protect Wilson.

The evidence viewed in Wilson's favor is also sufficient for a jury to find personal involvement by Hawk. Hawk admitted that there are endemic problems with gang violence at Miami. As with Hyatte, McGee told Hawk about Wilson's request for protective custody in 2019, and Wilson also sent Hawk a written message about his situation. Hawk had the authority to grant Wilson's request for protective custody, new that his request was denied, and took no steps to grant the request or otherwise protect Wilson. After the Crider attack, Wilson wrote Hawk, explaining that he had been attacked as he predicted, but Hawk took no steps to protect Wilson. Hawk was notified about Wilson's three requests for protective custody in 2020 but did nothing to protect Wilson. Hawk was notified about Wilson's report of the Mata assault but not take protective steps for Wilson.

The argument for summary judgment on failure to protect based on Hyatte's and Hawk's lack of personal involvement fails.

> b.    McGee

As to McGee, Defendants assert that Wilson failed to identify specific threats or individuals, was at times uncooperative with investigations, and was offered alternatives to protective custody.

However, Wilson has presented evidence of making McGee aware of how he was being targeted by members of the Hellraisers or Folks. He reported threats of violence, physical attack, and sexual assault by Hellraisers or Folks. While he did ask for one of his investigations to cease,

the evidence is that he did so out of fear of retaliation. A reasonable jury could find that McGee had notice of there being a substantial risk of serious harm to Wilson at the hands of a Hellraiser or Folks member. Because the safety risk was from these STGs at large instead of by a specific person, a reasonable jury could determine that offering a move to a different dormitory in a facility whose population has a 65% gang member rate was not a reasonable measure taken to prevent the assaults on Wilson.

Defendants maintain that Wilson's assertion that he was being targeted as a covered-up Hellraiser holds no water in light of the alleged perpetrators of sexual assault belonging to three different STGs. That said, Wilson has presented evidence that there is an overarching umbrella group—the "Folks"—of which the Hellraisers and other STGs are a part. Wilson has provided evidence that Larue was a part of Folks and Mata was a Hellraiser. Prison records show Wilbur to be a member of the Aryan Brotherhood, but there is no indication whether that group falls under the Folks umbrella. Still, at least two of the three alleged perpetrators belong to the groups Wilson says were targeting him—Folks and Hellraisers—in his February 25, 2020 request for productive custody.

Defendants further contend that Wilson never submitted an identifiable threat from any of the alleged attackers prior to his allegations of assault by them. This is Defendants' first argument repackaged. The evidence viewed most favorably to Wilson shows that he alerted McGee to the risk of serious harm that Wilson faced from the Hellraisers or Folks organizations. Defendants have presented no authority indicating that Wilson bore the burden to alert McGee as to which member of those organizations would cause the specific harm each time he was attacked. A reasonable jury could find for Wilson on this argument.

Defendants' motion for summary judgment is denied as to McGee.

2.  *Wilson's Motion for Summary Judgment*

As delineated by the Seventh Circuit's pattern jury instructions, there are five elements to a failure to protect claim: (1) there was a strong likelihood that Wilson would be seriously harmed as the result of an assault, (2) Defendants were aware of this strong likelihood that Wilson would be seriously harmed as the result of an assault, (3) Defendants consciously failed to take reasonable measures to prevent the assault, (4) Wilson would not have been harmed if Defendants had taken reasonable measures, and (5) Defendants acted under color of law. *See* Federal Civil Jury Instructions of the Seventh Circuit No. 7.16 (2017).

As an initial matter, the Court notes that Hyatte, Hawk, and McGee failed to respond to the Requests for Admission that Wilson served on them. Federal Rule of Civil Procedure 36(a)(3) provides that all matters in these unresponded-to Requests for Admission are now admitted. "A matter admitted under [Rule 36] is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." Fed. R. Civ. P. 36(b). Defendants have not moved to withdraw their admissions, so the admitted matters are conclusively established.

Still, the Court finds that summary judgment in Wilson's favor is not appropriate here. Wilson has evidence in the form of Defendants' admissions that they took no steps to protect Wilson from the strong likelihood of serious harm that they knew that he faced, which is enough to show that Defendants failed to take reasonable measures to protect Wilson. Likewise, the Court sees no genuine dispute about Hyatte, Hawk, and McGee acting under color of state law.

However, it is for a jury to decide what minimum level of action meets the requirement of reasonable measures. Wilson contends that he should have been granted protective custody, but "[p]rison officials do not violate the Eighth Amendment because the mode of protection they offer does not sit well with a prisoner. Rather, if they offer reasonable protection, they have done their

19

duty." *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008). Without knowing the metes and bounds of reasonable measures, the Court cannot determine whether Wilson would have been harmed if Defendants had taken those reasonable measures. Again, Wilson presents argument and evidence that if he had received protective custody he would not have been attacked, but that makes an assumption about reasonable measures that has not been established as the only decision a reasonable jury could make. Wilson also argues that he was attacked after receiving new housing assignments, so moving him within Miami's general population housing units was not a reasonable measure. Even so, on the evidence Wilson presents, a reasonable jury could find that measures less than protective custody (though, perhaps, more than a new general housing assignment) were reasonable, and Wilson's only argument regarding causation is that he would not have been attacked in protective custody.

The Court denies Wilson's motion for summary judgment.

### B. Counts IV to VI - Supervisory Liability (Hyatte, Hawk, and Klepinger)

Defendants argue that they should be granted summary judgment on Wilson's supervisory liability claims. The doctrine of *respondeat superior* does not apply in the § 1983 context to hold supervisors liable for the actions of their subordinates. Instead, supervisory liability attaches "if the supervisor, with knowledge of the subordinate's conduct, approves of the conduct and the basis for it." *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001). In other words, the supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Id.* The requirement is to act knowingly or with deliberate, reckless indifference. *Id.*

Defendants do not argue here that there was no deprivation of a right by one of Hyatte's, Hawk's, or Klepinger's subordinates. Instead, Defendants contend that the supervisory liability

20

claims should fail because of lack of personal involvement, saying "[a]t best Plaintiff alleges they
were cc'd on e-mails regarding Defendant's time in suicide watch and email regarding Prison Rape
Elimination Act reports (PREA)." (Defs.' Mot. at 3, ECF No. 95). Defendants' argument is belied
by the evidence supporting personal involvement. The same evidence of personal involvement by
Hyatte and Hawk discussed under part A above also shows why summary judgment for lack of
personal involvement is inappropriate as to Hyatte and Hawk here. From the evidence, a reasonable
jury could determine that Hyatte and Hawk knew about their subordinates' conduct and facilitated,
approved, condoned, or turned a blind eye to it.

As for Klepinger, the evidence viewed favorably to Wilson shows that she was aware of
gang violence at Miami through her attendance at incident management meetings and her review
of all investigation reports. She made a joke with a coworker about the high volume of PREA
reports. Klepinger was forwarded an email regarding Wilson being extorted in February 2020.
McGee emailed Klepinger describing Wilson's report of the Larue assault, and Klepinger took no
actions to protect Wilson. From the evidence presented, a jury could find personal involvement by
Klepinger.

Defendants' motion for summary judgment is denied as to Counts IV, V, and VI.

### C. Count VII - Failure to Provide Medical Attention (Brady)

Wilson has informed the Court that "Officer Brady," the defendant named in Count VII,
was never identified by Defendants, has not been served, and has not appeared. Wilson has notified
the Court that he does not oppose dismissal of Brady. Therefore, the Court dismisses Officer Brady
and Count VII.

### D. Defendants Smith and Williams

Defendants argue that Smith and Williams should be dismissed because none of Wilson's seven counts are brought against them. Wilson admits that he forgot to add separate counts for Smith and Williams in his pleading, but he contends that, as he has presented evidence sufficient to withstand summary judgment against these defendants, Smith and Williams should not be dismissed.

As a starting point, "defendants are entitled to fair notice of each claim against them, as required by the Federal Rules of Civil Procedure." *Schmees v. HC1.com, Inc.*, 77 F.4th 483, 488 (7th Cir. 2023). Still, in *Schmees*, the Seventh Circuit held that the district courts have discretion to treat new allegations in summary judgment briefing as constructive motions to amend. *Id.* The Seventh Circuit "wholeheartedly agreed[d]" that "the practice of amending by brief seems inappropriate," but cautioned that "inappropriate and impermissible are not synonyms." *Id.* at 489. Despite the district courts' discretion to treat claims raised for the first time in briefs as constructive motions to amend, "[i]t will rarely be appropriate to do so." *Id.* at 490. When considering a constructive motion to amend in summary judgment briefs, courts should apply the standard for a motion to amend, "paying particular attention to the potential for prejudice to other parties." *Id.* Though "an improbable confluence of events might justify constructive amendment[,] [s]uch a confluence will be all but impossible for a counseled plaintiff to establish. *Id.* at 489.

Wilson, originally litigating *pro se*, sued just three defendants in his initial complaint: Commissioner Carter of the Indiana Department of Corrections, Hyatte, and McGee. (Compl., ECF No. 1). Once he obtained counsel, Hyatte, Hawk, Brady, and McGee were named in the first amended complaint. (Am. Compl., ECF No. 18). In the second amended complaint, filed April 19, 2021, Wilson added Klepinger, Smith, and "Officer Doe" as defendants. (2d Am. Compl., ECF

No. 28). None of the counts in the second amended complaint state that they are brought against Smith or Doe. *Id.* The third amended complaint was filed by June 21, 2021, with the consent of the parties to substitute Williams in place of Officer Doe. (3d Am. Compl., ECF No. 38).

The third amended complaint fails to provide Smith and Williams with fair notice of the claims against them. The allegations state that Smith and Williams were both involved in one denial each of Wilson's requests for protective custody, but the allegations do not rise to the level of fair notice of a § 1983 failure to protect claim.

In opposing Defendants' request for the dismissal of Smith and Williams, Wilson tries to pass blame to Defendants for not moving to dismiss Smith and Williams for failure to state a claim or for moving for a more definite statement. While one of these motions earlier in the litigation would have clarified matters, it does not excuse Wilson's failure to bring counts against Smith and Williams.

So it remains the task of the Court to determine whether constructive amendment should be allowed. The Court finds that it should not. Federal Rule of Civil Procedure 15(a) provides that a party "may amend its pleading only with the opposing party's written consent or the court's leave" and that "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The United States Supreme Court has explained that "freely give" means that, in the absence of any apparent or declared reasons (e.g., undue delay, bad faith, dilatory motive), repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to an opposing party, or futility of the amendment, the court should grant leave. *Foman v. Davis*, 371 U.S. 178, 182 (1962). And, as noted above, in the current procedural posture, the Court should pay particular attention to the prejudice to the other parties.

The Court sees no bad faith or dilatory motive behind Wilson's failure to bring claims against Smith and Williams. However, there has been considerable delay without any reason provided to excuse it or find it anything but unwarranted and undue. The Court also finds that the other parties will be prejudiced if amendment is allowed. Discovery has closed, and Smith and Williams may well have further discovery to pursue if they need to defend against counts newly brought against them. The Court is also skeptical that the new claims would pass muster under the statute of limitations, thought that issue need not be fully decided here without the benefit of argument from the parties.

Simply put, Wilson has had the benefit of counsel for the filing of his last three complaints. The circumstances here are do not comprise the "improbable confluence of events" where constructive amendment via summary judgment briefing is appropriate. The Court grants the request to dismiss Smith and Williams.

## CONCLUSION

Based on the above, the Court **DENIES in part** and **GRANTS in part** Defendants' Motion for Summary Judgment [DE 94]. The Court also **DENIES** Plaintiff Robert Wilsons's Motion for Partial Summary Judgment [DE 99].

The Court **DISMISSES** Defendants Kimberly Smith, James Williams, and Officer Brady. Count VII of the Third Amended Complaint is **DISMISSED**.

Though the summary judgment filings have been maintained under seal, Wilson has informed the Court that the need to seal the filings has ended now that Wilson has been released from custody. *See* (Pl.'s Resp. at 13 n.1, ECF No. 126). Defendants have not specified whether they believe lifting the seal on the summary judgment filings is appropriate. Therefore, the Court **ORDERS** Defendants to **FILE <u>on or before April 15, 2024</u>**, a statement on the propriety of

maintaining the seal on docket entries 97 (Defendants' exhibits in support of summary judgment), 99 (Wilson's motion for summary judgment), 100 (Wilson's statement of material facts), 101 (Wilson's brief in support of summary judgment), and 102 (Wilson's exhibits in support of summary judgment).

SO ORDERED on March 27, 2024.

s/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN, JUDGE
UNITED STATES DISTRICT COURT